# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TEXARKANA DIVISION

| | |
|---|---|
| HEALTH CHOICE GROUP, LLC and JAIME GREEN, on behalf of the UNITED STATES OF AMERICA; STATE OF ARKANSAS; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF INDIANA; STATE OF IOWA; STATE OF LOUISIANA; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF MONTANA; STATE OF NEVADA; STATE OF NEW HAMPSHIRE; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OKLAHOMA; STATE OF RHODE ISLAND; STATE OF TENNESSEE; STATE OF TEXAS; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; and STATE OF WASHINGTON,<br>    Plaintiffs/Relators,<br><br>v.<br><br>BAYER CORPORATION; AMGEN INC.; ONYX PHARMACEUTICALS, INC.; AMERISOURCEBERGEN CORPORATION; and LASH GROUP,<br><br>    Defendants. | Civil Action No.: 5:17-CV-126-RWS-CMC<br><br>**RELATORS' SURREPLY TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT** |

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................1

II. DEFENDANTS' CONDUCT VIOLATES THE AKS ..........................................1

    A. The Free Nurse and Support Services Programs Violate the AKS ............................................................................................................1

    B. White-Coat Marketing by the Nurse Educators Violates the AKS ............................................................................................................4

III. RELATORS HAVE ADEQUATELY PLEADED SCIENTER .........................5

IV. THE AC SATISFIES RULE 9(b) ...........................................................................7

V. RELATORS HAVE ADEQUATELY PLEADED CONSPIRACY ..................10

VI. RELATORS' STATE LAW CLAIMS SHOULD NOT BE DISMISSED ..........................................................................................................11

VII. RELATOR GREEN WAS PROPERLY ADDED TO THE CASE ..................12

VIII. CONCLUSION ......................................................................................................14

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*C.W. v. James Zirus*,
   2012 WL 12919096 (W.D. Tex. June 6, 2012) ...................................................................7, 9

*Hernandez v. CIBA-GEIGY Corp. USA*,
   2000 WL 33187524 (S.D. Tex. Oct. 17, 2000) ........................................................................10

*Hisey ex rel. Estate of Benavides v. Fisher-Price, Inc.*,
   2003 WL 22332134 (N.D. Tex. Aug. 6, 2003) .........................................................................7

*In re Elec. Data Sys. Corp. "ERISA" Litig.*,
   305 F. Supp. 2d 658 (E.D. Tex. 2004) .....................................................................................11

*Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.*,
   2009 WL 1174641 (N.D. Tex. Apr. 29, 2009) ........................................................................10

*Mackey v. Fluor Intercontinental Inc.*,
   2015 WL 6125984 (S.D. Tex. Oct. 16, 2015) ...........................................................................7

*Sabine v. United States*,
   1996 WL 365651 (E.D. La. June 28, 1996) ............................................................................11

*St. Paul Mercury Ins. Co. v. Williamson*,
   224 F.3d 425 (5th Cir. 2000) ...................................................................................................10

*United States ex rel. Boise v. Cephalon, Inc*,
   2014 WL 5089671 (E.D. Pa. Oct. 9, 2014) .............................................................................13

*United States ex rel. Brown v. Celgene Corp.*,
   2014 WL 3605896 (C.D. Cal. July 10, 2014) .........................................................................12

*United States ex rel. Harman v. Trinity Indus. Inc.*,
   872 F.3d 645 (5th Cir. 2017) .....................................................................................................6

*United States ex rel. Howard v. Lockheed Martin Corp.*,
   2011 WL 4348104 (S.D. Ohio Sept. 16, 2011) ......................................................................13

*United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*,
   865 F.3d 29 (1st Cir. 2017) .......................................................................................................9

*United States ex rel. Streck v. Allergan, Inc.*,
   894 F. Supp. 2d 584 (E.D. Pa. 2012) ..................................................................................6

*United States ex rel. Wall v. Vista Hospice Care, Inc.*,
   778 F. Supp. 2d 709 (N.D. Tex. 2011) ................................................................................7

*United States v. Exec. Health Res., Inc.*,
   196 F. Supp. 3d 477 (E.D. Pa. 2016) ................................................................................12

*United States v. Homeward Residential, Inc.*,
   2015 WL 3776478 (E.D. Tex. June 17, 2015)..................................................................13

*United States ex rel. Colquitt v. Abbott Labs.*,
   2016 WL 3571329 (N.D. Tex. Mar. 8, 2016) ....................................................................6

*Visiting Nurse Ass'n of Brooklyn v. Thompson*,
   378 F. Supp. 2d 75 (E.D.N.Y. 2004) ..................................................................................6

*Waldmann v. Fulp*,
   259 F. Supp. 3d 579 (S.D. Tex. 2016) ................................................................................6

## I. INTRODUCTION

Defendants' motion to dismiss reply (Dkt. 66, the "Reply") largely rehashes Defendants' original arguments, which Relators disproved in their opposition (Dkt. 52, the "Opposition" or "Opp.").[1] Defendants again downplay or ignore Relators' detailed allegations, while continuing to press a pleading standard that the Fifth Circuit has expressly rejected. But if Defendants' aspirational view of the law were correct, Rule 9(b) would bar virtually all AKS/FCA cases, including cases – such as this one – that are meritorious, have been carefully investigated, and bear directly on public health and safety. Relators have provided sufficient factual details to plead their claims, and the motion to dismiss should be denied.

## II. DEFENDANTS' CONDUCT VIOLATES THE AKS

The three schemes spelled out in the AC violate the AKS. Defendants' contrary arguments are unavailing.

### A. The Free Nurse and Support Services Programs Violate the AKS

As Relators demonstrated, in exchange for prescriptions for Covered Products, Defendants, through the Free Nurse and Support Services programs, took over and underwrote critical aspects of Prescribers' provision of patient care. Opp. at 4-5. The challenged conduct eliminated substantial expenses that Prescribers customarily bear, and extended well beyond "product support" connected to the administration of the Covered Products. Opp. at 9-12. For example, the AC alleges that, in addition to teaching patients how to administer the Covered Products, the nurses in the Free Nurse program devote significant time to providing actual medical assistance and advice to patients. AC ¶¶ 96, 97, 103, 104. This care would have otherwise been provided by Prescribers, and thus Defendants' action resulted in Prescribers

---

[1] The Surreply uses the same abbreviations and defined terms that were used in the Opposition.

1

improving their bottom line. AC ¶¶ 98, 101, 102, 105, 106. Similarly, the Support Services program relieves Prescribers and their staff of the substantial, non-billable burden of managing the insurance process, including training the Prescriber's staff on how to best navigate the complicated process. AC ¶¶ 152, 153, 166. The AC also alleges that these services were provided with one goal in mind: to induce Prescribers to prescribe the Covered Products. AC ¶¶ 89, 91, 92, 107, 146, 158, 167. The Schemes thus fall squarely within the prohibitions of the AKS.

Unable to contest that the Free Nurse and Support Services programs result in Prescribers' receiving "remuneration" within the meaning of the AKS, Defendants again invoke the OIG's guidance that applies to "*purchasers*" and argue that it absolves them of liability. Reply at 2 (citing 68 Fed. Reg. 23731 § 11.B(2)(b)(B)(1)(a), 2003 WL 2010428 (the "OIG Guidance")). Not so. As Relators demonstrated in the Opposition, the OIG Guidance expressly provides *different* standards for "purchasers" and Prescribers. In the case of Prescribers, the OIG Guidance makes clear that the AKS is implicated by (1) any "service" that would "*eliminate an expense the physician would have otherwise incurred*"; or (2) any "service" that is "sold to a physician *at less than fair market value*." 68 Fed. Reg. 23731 § IIB(2)(b)(B)(1)(b) (emphasis added). Defendants offer no response to Relators' showing, instead asserting that the distinction between "purchasers" and Prescribers was purportedly "made up from whole cloth." Reply at 2. This is simply false, as the actual text of the OIG Guidance itself establishes.

Defendants also contend that Relators' Opposition "shows that courts consistently apply the same OIG Guidance to services provided to physicians." Reply at 3. This too is incorrect. For instance, in Defendants' principal case, *United States v. Medtronic, Inc*., the complaint alleged that the defendant provided free services to "physicians and others *with purchasing*

2

1359631

*power* to select Medtronic devices." 2017 WL 2653568, at *1 (E.D. Pa. June 19, 2017). This is a critical distinction that Defendants ignore.

In any event, as explained in Relators' Opposition and *supra*, even if the OIG's Guidance for "purchasers" were to apply, the AC adequately pleads Defendants' AKS violations. Opp. at 9-14. The Free Nurse and the Support Services program provide substantial value to the Prescribers that extend beyond "product support." This is because both programs eliminate *substantial* expenses the Prescribers would otherwise have to incur. *See* AC ¶¶ 96-107 (noting that the Free Nurse program eliminates the need for Prescribers to hire their own staff to provide the education services Bayer and Amgen are providing); *id.* ¶¶ 152-53 (noting that the Support Services program eliminates substantial expenses the Prescribers would otherwise have to incur). These allegations are fatal to Defendants' motion to dismiss. Indeed, even the 2000 OIG opinion that Defendants accuse Relators of "ignoring," states the AKS is implicated when services that may have no independent value are combined "with other services or programs which do confer an independent financial benefit upon referring providers." OIG Advisory Opinion No. 00-10, 2000 WL 35747420, at *5; Reply at 4. The full package of benefits Defendants offer in exchange for prescriptions unquestionably provides a significant and wide-reaching benefit to Prescribers by freeing them from the expensive burdens of ongoing patient management and insurance management.

At the end of the day, Defendants' assertion that the Free Nurse and Support Services programs are immune from scrutiny because they are offered strictly in conjunction with Bayer and Amgen's efforts to market the Covered Products to Prescribers fails as a matter of law. Taking over critical aspects of patient care in exchange for prescription is the very type of practice the AKS was designed to curb. Indeed, taking Defendants' position at face value, there

3

1359631

would be nothing wrong with Defendants completely taking over the Prescribers' provision of patient care because, under Defendants' logic, all such care could be characterized as "product support." In Defendants' world, Prescribers' roles would be limited to writing prescriptions, and Defendants would be free to do everything else. And patient care would be relegated to whichever Big Pharma company offered the highest incentives. That, of course, is not the law. No amount of misdirection can alter this fact.

### B. White-Coat Marketing by the Nurse Educators Violates the AKS

In their motion, Defendants argued that Relators' White Coat Marketing allegations fail because (1) the "nurse educators" were allegedly not acting as sales reps; and (2) the AKS has statutory and regulatory "safe harbors" that expressly permit pharmaceutical companies to engage non-employees to provide services. Relators disproved both of these points in the Opposition. *See* Opp. at 12-14. In their reply, Defendants ignore Relators' showing and continue to press their meritless assertions.

Defendants assert that "none of the nurse educators . . . quoted by Relators in the FAC allege to have undergone any sales or marketing training." Reply at 5-6. But the AC expressly alleges that "Bayer and Amgen invested heavily in training nurse educators how to gain access to Prescribers and promote the Covered Products." AC ¶ 118. Further, the AC alleges that the nurse educators were "trained on how to overcome Prescriber and staff objections." *Id.* ¶ 119. And, to further illustrate the type of training the nurse educators received, the AC explains that Relator Green "was trained in person for an entire week," "[t]he training focused on sales techniques," and "[a]t the end of the week, the trainees . . . had to demonstrate how they would market the product to the Prescribers." *Id.* ¶ 120. The notion that the AC does not allege that the nurse educators were trained to promote the Covered Products is nothing more than wishful thinking.

4

1359631

Defendants, having previously made no effort to demonstrate that the "personal services" safe harbor set forth in 42 C.F.R. § 1001.952(d) applies to the challenged conduct, also assert that the White Coat Marketing program is wholesale exempt from AKS scrutiny. In particular, Defendants assert that Relators' reading of the safe harbor creates a circular interpretation under which the provisions can never apply. Reply at 6. Defendants are attacking a strawman. Relators' point is quite simple: the AKS is still violated where individuals in a unique position of trust – white-coated nurses – are paid to recommend the Covered Products to Prescribers and their patients. In other words, inserting intermediaries between the pharmaceutical company and physicians in the unlawful marketing scheme does not immunize Defendants' conduct. To support their position, Relators quoted the DHHS's own interpretation of the safe harbor provision. *See* 56 Fed. Reg. 35952 (1991) ("[W]e have experienced many instances where promoters and consultants have become involved in marketing activities *that encourage health care providers and others to violate the statute . . . . It would be inappropriate to allow such activities to receive safe harbor protection. Thus, we are adding paragraph (d)(6) to this safe harbor provision to make clear that the service that is contracted for is not protected if it involves the counselling or promotion of a business arrangement or other activity which itself constitutes a violation of any State or Federal law*."). Tellingly, Defendants completely ignore Relators' argument.

## III. RELATORS HAVE ADEQUATELY PLEADED SCIENTER

Relators have demonstrated that Defendants' reliance on the "reasonable interpretation of the law" exemption to the AKS is unavailing under both the law and the facts of this case. Opp. at 15-22. In their reply, Defendants argue that, to evade AKS liability, they do not have to show that they *actually* believed that they were in compliance with the law. Instead, Defendants assert that they need only show the mere existence of a reasonable interpretation of the law under

5

which their activity was permissible. Reply at 7. This is not the law. As set forth in Relators' Opposition, a defendant must show that it *actually relied* on a reasonable interpretation of the law in order to defeat scienter allegations, and, indeed, Defendants offer no case law supporting their argument to the contrary. Reply at 6, 7; Opp. at 16. *See*, *e.g.*, *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 657 (5th Cir. 2017) (assessing defendant's claim "that it could not have acted knowingly or recklessly if *it was acting pursuant to* a reasonable interpretation of the disclosure requirements") (emphasis added); *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 629 (S.D. Tex. 2016) ("While it is true that FCA liability does not attach to reasonable but erroneous interpretations of the law . . . the statute requires a defendant *to actually come to* that reasonable but incorrect conclusion."); *United States ex rel. Colquitt v. Abbott Labs.*, 2016 WL 3571329, at *2 (N.D. Tex. Mar. 8, 2016) (assessing "whether Defendants' *reliance on* a reasonable interpretation of an ambiguous requirement precludes a finding of 'reckless disregard') (emphasis added); *Visiting Nurse Ass'n of Brooklyn v. Thompson*, 378 F. Supp. 2d 75, 96 (E.D.N.Y. 2004) ("FCA liability is inappropriate only where a claimant has *reasonably relied on* its interpretation of the law") (emphasis added).[2]

Defendants' reliance on *United States ex rel. Streck v. Allergan, Inc.*, 894 F. Supp. 2d 584, 596 (E.D. Pa. 2012), is misplaced. The *Streck* court found that there was no evidence to suggest that the defendants were not in fact acting according to a reasonable interpretation of the relevant law. *Id*. But here Relators have demonstrated that Defendants' interpretation of the law is *objectively unreasonable*, and Defendants themselves have admitted that the OIG Guidance at issue cautions marketplace participants against engaging in the very conduct alleged in the AC. Reply at 2 (admitting that the OIG Guidance instructs that services provided to a

---

[2] To be clear, it is not Relators' position that, at the pleading stage, the court may not consider whether the defendants' purported interpretation of the law is reasonable. Reply at 6, 7.

6

physician *may* trigger AKS liability). Further, the AC contains ample allegations demonstrating that Defendants carried out their schemes with full knowledge of their illegality, and not under a good faith effort to comply with the AKS. Opp. at 18-22. Defendants' attempt to cast these facts as "legal conclusions" when they are plainly nothing of the sort is unavailing. Reply at 8. Accordingly, dismissal is not appropriate.

### IV. THE AC SATISFIES RULE 9(b)

As set forth in Relators' Opposition, Rule 9(b) is applied in FCA cases with flexibility and with consideration of the particular circumstances rather than as a legal straightjacket. Opp. at 23, 24; *see also*, *e.g.*, *Mackey v. Fluor Intercontinental Inc.*, 2015 WL 6125984, at *4 (S.D. Tex. Oct. 16, 2015) ("Rule 9(b) is context specific and flexible and must remain so to achieve the remedial purpose of the FCA."); *United States ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 715 (N.D. Tex. 2011) (citing *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180 (5th Cir. 2009)).

In their reply, Defendants continue to ignore this guidance and again urge a standard that is unsupported by precedent and unreasonable. Reply at 9, 10. Although Rule 9(b) requires fraud claims to be pleaded with particularity, "it is also well established that Rule 9(b) must be read in conjunction with Rule 8, under which a complaint only need give the defendant '*fair notice of what the plaintiff's claim is and the grounds upon which it rests*.'" *Hisey ex rel. Estate of Benavides v. Fisher-Price, Inc.*, 2003 WL 22332134, at *2 (N.D. Tex. Aug. 6, 2003) (emphasis added); *see also* C.*W. v. James Zirus*, 2012 WL 12919096, at *2 (W.D. Tex. June 6, 2012) ("While the pleading burden of Rule 9(b) demands particularity, a "complaint need not . . . state all facts pertinent to a case to satisfy the requirements."). As Relators explained in the Opposition, the AC provides ample detail describing: Defendants' motives (AC ¶¶ 14, 94, 99); the development and administration of the nurse education program by Bayer, Amgen, and

7

Amerisource ((Scheme 1) AC ¶¶ 92-95); the scope of the Free Nurse program and the benefits the program confers on Prescribers and their staff, which induce them to prescribe the Covered Products (AC ¶¶ 97-107); the manner in which nurses that participate in the White Coat Marketing program are trained, expected to and ultimately do in fact promote the Bayer and Amgen products ((Scheme 2) AC ¶¶ 108-144); the development of the Support Services program by Bayer, Amgen, and Amerisource ((Scheme 3) AC ¶¶ 146-150); an explanation of how the Support Services program functions and how it provides benefits to Prescribers and their staff that induce them to prescribe Bayer and Amgen products (AC ¶¶ 151-167); the nation-wide scope of the schemes (AC ¶¶ 184-190); the time-frame of the expansive and long-lasting schemes (AC ¶¶ 184-188); the Government Programs that reimburse prescriptions for the Covered Products (AC ¶¶ 43-86); an explanation of why claims submitted to the Government programs for the Covered Products are false claims (AC ¶¶ 3-15, 29-38, 47-57, 67, 68, 80, 85, 188, 190-204); and an explanation of why Defendants knew that these false claims would be submitted (AC ¶¶ 85, 161, 184-204). This level of detail satisfies the applicable pleading standard, and certainly meets the "fair notice" requirement of Rule 9(b).

Unable to debate Relators' showing, Defendants assert that all that the AC describes are "established industry practices long-known to regulators." Reply at 10. This argument fails. First, Defendants' assertion that the alleged activity constitutes "established industry practices" raises several questions of fact. Second, even if the conduct has become common practice in the industry, that does not make it legal. Third, Defendants' assertions underscore that Defendants *fully appreciate what this litigation is about.* In sum, Defendants' claim that schemes described in the AC are "established industry practices" is nothing more than a confirmation that, while Defendants may challenge the AC's allegations on the merits, the AC adequately pleaded its

8

claims of violations of the AKS. This is more than sufficient information to provide Defendants with fair notice of the charges against them. *See C.W. v. James Zirus*, 2012 WL 12919096, at *2 (W.D. Tex. June 6, 2012) ("The focal point of the [Rule 9(b)] inquiry is whether allegations contained in the pleading provide the defendant with fair notice of the plaintiffs' claims.").

Defendants similarly argue that Relators' "allegations that false claims were submitted" are insufficient. Reply at 11. Here too, Defendants are simply ignoring the AC's allegations. The AC alleges that Defendants carried out their schemes in order to induce Prescribers to prescribe the Covered Products. AC ¶¶ 3-6, 88-91. It alleges that, because of the high cost of the Covered Products, "most, if not all patients" pay for the Covered Products through their insurance rather than out of pocket. AC ¶ 158. The AC also alleges that tens of thousands of reimbursement claims for the Covered Products were submitted to Medicare *each year* between 2011 and 2015 in addition to Medicaid claims from numerous states. AC ¶¶ 190-204. The AC further indicates that between 70% and 95% of Prescribers utilized Support Services. AC ¶ 164. The AC also alleges that the White Coat Marketing program targeted high-volume Prescribers. *Id.* ¶¶ 123-24. Finally, the AC alleges that Defendants coordinated the payment of insurance benefits for patients with Medicaid and Medicare who had been prescribed the Covered Products. *Id.* ¶¶ 159-161. These allegations satisfy Rule 9(b) because they demonstrate "that it is statistically certain that [Defendants] caused third parties to submit many false claims to the government." *United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 41 (1st Cir. 2017) (finding that under the "'more flexible' approach to evaluating the sufficiency of fraud pleadings in connection with indirect false claims for government payment," relators alleged causation even though "[t]he complaint is devoid of particularized allegations [] that any doctor

9

submitted a claim he or she would not have submitted" if not for the defendants' improper actions).

The AC outlines the particulars of the fraud in sufficient detail and readily meets the Fifth Circuit's pleading standard. The Court should reject Defendants' arguments that, at the pleading stage, Relators should be required to *prove* their claims and spell out each and every detail of Defendants' fraud. *See Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc*., 2009 WL 1174641, at *6 (N.D. Tex. Apr. 29, 2009)(noting that Rule 9(b) "is not intended 'to procure punctilious detail,' and the particularity demanded by Rule 9(b) differs with the facts of each case. . . . It must also be viewed in light of Rule 8's goal of 'simple, concise, and direct' pleadings"); *Hernandez v. CIBA-GEIGY Corp. USA*, 2000 WL 33187524, at *5 (S.D. Tex. Oct. 17, 2000) ("A complaint need not state all facts pertinent to a case in order to satisfy the requirements of Rule 9(b). . . . Thus, the focus of a Rule 9(b) inquiry should be whether, given the nature and facts of the case and the circumstances of the parties, the pleading in question is sufficiently particular to satisfy the purposes of Rule 9(b).") (citation omitted).

## V. RELATORS HAVE ADEQUATELY PLEADED CONSPIRACY

As Relators demonstrated in the Opposition, the AC adequately pleads Relators' conspiracy claims under the Fifth Circuit standard. Opp. at 33-35. Faced with Relators' identification of the numerous allegations supporting the conspiracy claims, Defendants attempt to trivialize Relators' allegations. Reply at 13. Defendants' complaints are misplaced. The AC sufficiently pleads the details required at this stage. *See*, *e.g.*, *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 434 (5th Cir. 2000) (noting that "the form of the complaint is not significant if it alleges facts upon which relief can be granted") (citation omitted).

## VI. RELATORS' STATE LAW CLAIMS SHOULD NOT BE DISMISSED

In the Opposition, Relators demonstrated that Defendants' cursory arguments for dismissal of Relators' state law claims failed. *See* Opp. at 35-37. Unable to dispute Relators' showing, Defendants now complain that the FAC "makes no attempt to identify or account for . . . distinctions" between the AKS and its state analogues. Reply at 14. But Relators have no such obligation. *See In re Elec. Data Sys. Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658, 663 (E.D. Tex. 2004). The AC identifies the laws under which Relators' claims arise, and the facts supporting each such claim. If Defendants want the Court to dismiss those claims, it is *Defendants'* burden to perform the legal analysis. *See Sabine v. United States*, 1996 WL 365651, at *1 (E.D. La. June 28, 1996) ("When seeking dismissal for failure to state a claim, the moving party has the burden of showing that plaintiff can prove no set of facts consistent with the allegations in the complaint which would entitle it to relief."). Defendants have not even attempted to meet their burden, and as such the motion should be denied.

Defendants' purported analysis of the Texas Medicaid Fraud Prevention Act ("TMFPA") underscores the dubious nature of Defendants' motion. In their opposition, Relators explained that under the TMFPA, a plaintiff does not need to show the presentation of a false claim as is required to prove liability under the Federal FCA. Opp. at 36. The differences between the TMFPA and the FCA were confirmed and elaborated upon by the State of Texas itself in its March 26, 2018 Statement of Interest ("SOI"). Dkt. 54 (explaining that "it is incorrect to assert that the TMFPA and the FCA should be read as identical when the language of each statute demonstrates that there are many significant differences that affect both the substance of claims that may be asserted as well as the remedies that are available"). Yet in their reply, Defendants continue to maintain that there are no meaningful distinctions between the TMFPA and the FCA,

11

going so far as to accuse the State of Texas of incorrectly interpreting *its own law*.[3]  Reply at 14, 14 n. 16.  Defendants are just wrong.

Defendants again assert that Relators' state law claims should be dismissed because the AC does not include allegations of "misconduct . . . in [each] specific state."  Reply at 14-15.  Relators debunked this argument in their opposition.  Opp. at 36.  Again, Relators' identification of a nation-wide fraudulent scheme, with representative examples of the uniform perpetration of that scheme in numerous states, is sufficient to support Relators' state law claims.  *See United States v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 496 (E.D. Pa. 2016) (declining to dismiss relator's 27 state law claims where relator alleged a nation-wide scheme and provided examples of activity in four states); *United States ex rel. Brown v. Celgene Corp.*, 2014 WL 3605896, at *10 (C.D. Cal. July 10, 2014) (declining to dismiss state law claims despite a lack of state-specific allegations because the complaint "makes allegations about Celgene's nationwide, systemic practices" that were not limited to the activities in the state discussed in the complaint).

## VII. RELATOR GREEN WAS PROPERLY ADDED TO THE CASE

Relators provided both explanation and case law demonstrating that the addition of Green as a co-relator does not trigger the first-to-file rule.  Opp. at 38, 39.  Defendants respond that "Relators are incorrect," but this assertion is based on nothing more than Defendants' say-so.

---

[3] Defendants claim that the State of Texas "disregarded" the purported causation element of the TMFPA.  Reply at 14 n. 16.  The issue of causation was in fact specifically addressed in the SOI, where the State of Texas confirmed that the TMFPA does *not* require proof of causation for liability.  Dkt. 54 at 9-10 ("Defendants argue that Relator failed to plead a causal link between the submission of false claims and the conduct alleged. . . . Defendants' argument, however, is irrelevant to the Texas causes of action for the same reason that their other arguments fail. Neither the TMFPA unlawful acts nor the related Texas AKS violations applicable here require this Court to look beyond whether Relators sufficiently plead that the Defendants offered or paid kickbacks in connection with products that may be paid by Texas Medicaid.")  The language cited by Defendants as evidence of a causal element pertains to the determination of appropriate civil remedies, not to liability.  Reply at 14 (citing Tex. Hum. Resources Code § 36.052).

Defendants' citation to yet another entirely inapposite case does not rebut Relators' arguments. Reply at 15 (citing *Capshaw v. White*, 2017 WL 3841611, at *2 (N.D. Tex. Jan. 23, 2017) (assessing an FCA complaint in which two separate, independently filed cases were joined into one case).

Defendants also ignore authority from this District on this very issue. In *Homeward Residential*, the court found that the voluntary addition of a relator after a complaint is unsealed does not implicate the first-to-file rule. *United States v. Homeward Residential, Inc.*, 2015 WL 3776478, at *5 (E.D. Tex. June 17, 2015). The *Homeward* court also explained why policy considerations *favor* the addition of additional relators. *Id.* (explaining that "barring a second relator who has been voluntarily added to an existing qui tam action would not advance the purpose of the first-to-file bar"); *see also United States ex rel. Boise v. Cephalon, Inc*, 2014 WL 5089671, at *5 (E.D. Pa. Oct. 9, 2014) (explaining how policy considerations of first-to-file rule support finding that voluntary addition of relators is permissible). Indeed, barring the addition of "a second relator to an existing suit could have a negative consequence of discouraging voluntary agreements between relators with information concerning related claims against a single defendant and decrease judicial efficiency." *Homeward Residential*, 2015 WL 3776478, at *5. *See also United States ex rel. Howard v. Lockheed Martin Corp.*, 2011 WL 4348104, at *4 (S.D. Ohio Sept. 16, 2011) (concluding that "policy considerations favor" the addition of relators by amended complaint because this "does not require the duplicative expenditure of time and resources that a separate action [in another court] would have entailed" and noting that since Relators "have reached a private agreement as to the distribution of any recovery[,]" defendant "is not at risk for multiple or inconsistent judgments by the addition of [relators] to this action").

Because the first-to-file rule simply does not apply to the circumstances of this case, there is no reason to dismiss Green.

## VIII. CONCLUSION

For the foregoing reasons and those set forth in Relators' Opposition, Defendants' Motion to Dismiss should be denied.

1359631

Dated: April 20, 2018

Respectfully submitted,

*/s/ Sam Baxter*
Samuel F. Baxter (co-lead counsel)
sbaxter@mckoolsmith.com
Jennifer L. Truelove
jtruelove@mckoolsmith.com
MCKOOL SMITH P.C.
104 East Houston, Suite 300
Marshall, Texas 75670
(903) 923-9000
Fax: (903) 923-9099

Eric B. Halper
ehalper@mckoolsmith.com
Radu A. Lelutiu
rlelutiu@mckoolsmith.com
Dana E. Vallera
dvallera@mckoolsmith.com
Karla Y. Valenzuela
kvalenzuela@mckoolsmith.com
MCKOOL SMITH P.C.
One Bryant Park, 47th Floor
New York, New York 10036
(212) 402-9400
Fax: (212) 402-9444

*/s/ W. Mark Lanier*
Mark Lanier (co-lead counsel)
WML@LanierLawFirm.com
Christopher L. Gadoury
Chris.Gadoury@LanierLawFirm.com
Ryan Ellis
Ryan.Ellis@LanierLawFirm.com
THE LANIER FIRM
6810 FM 1960 West
Houston, Texas 77069
(800) 723-3216
Fax: (713) 659-2204

***ATTORNEYS FOR RELATORS***

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on April 20, 2018 to counsel of record who are deemed to have consented to electronic services via the Court's CM/ECF system.  Any other counsel of record will be served by electronic mail, facsimile, U.S. Mail and/or overnight delivery.

*/s/ Radu A Lelutiu*
Radu Lelutiu
