**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

———————————————————————— )
UNITED STATES OF AMERICA, *et al.* )
*ex rel*. HEALTH CHOICE GROUP, LLC, )
     )
        Plaintiff, )
     )      No. 5:17-CV-126-RWS-CMC
        v. )
     )
BAYER CORPORATION, ONYX )
PHARMACEUTICALS, INC., )
AMERISOURCEBERGEN CORPORATION, & )
LASH GROUP, )
     )
        Defendants. )
————————————————————————)

**REPLY MEMORANDUM IN SUPPORT OF THE UNITED STATES'**
**MOTION TO DISMISS RELATOR'S SECOND AMENDED COMPLAINT**

The investors behind Venari Partners LLC, dba "NHCA Group," filed substantially the

same allegations against dozens of defendants—at times, copied word-for-word—in eight

judicial districts throughout New York, Massachusetts, Pennsylvania, Illinois, Washington, and

Texas.  The Department of Justice, in coordination with several investigative agencies, devoted

considerable time and resources to investigating this group of cases over a lengthy period of

time.  In all of the cases, the Department attorneys reached the same conclusion:  that the

allegations lack sufficient factual and legal support to establish a violation of the False Claims

Act.

Having already expended substantial resources on these matters, the United States now

seeks to exercise its statutory right to dismiss the actions.  Informed by several years of

investigations and analysis by attorneys from the Department of Justice and the Department of

Health and Human Services Office of Inspector General (HHS-OIG), the United States has

1

concluded that, not only do the allegations lack factual and legal support, but further litigation will impose burdens and costs on the government that are not justified and will undermine practices that benefit federal health care programs by providing patients with greater access to product education and support.

In response, Relator claims that the Department of Justice is seeking to "legalize certain kickbacks" and "gut" the False Claims Act.  Just because the Relator claims the defendants have engaged in illegal kickbacks, however, does not make it so.  Relator's arguments erroneously presume the very factual and legal support that the government's multiple investigations have found to be lacking.   More fundamentally, however, Relator ignores the proper question before the Court.  The question is not whether Relator (or this Court) would have made a different cost-benefit determination.  Under the FCA and a substantial body of case law interpreting it, the United States is entitled to broad deference to decide which claims should be prosecuted on its behalf.  Whether this broad deference is viewed as giving the government unfettered discretion to dismiss an action (as some courts have found and the government contends), or allows the government to dismiss if it articulates a rational basis (as other courts have held), none of Relator's arguments provides a basis to override the government's reasoned determination that the litigation should not proceed and that the claims should be dismissed.  Under these circumstances, the government's decision to dismiss is within the broad grant of authority provided by Congress, and should be affirmed.

## ARGUMENT

### I.      Relator's Factual Recitation is Incomplete and Inaccurate

Relator devotes thirty-five pages of its response to characterizing the work of NHCA Group and the government's investigation.  Not only does this recitation misstate or omit key

facts, but more importantly, it fails to provide any basis for the Court to conclude that the

government has abused its broad discretion to dismiss this matter.  In particular, Relator's

discussion avoids the government's legitimate concerns about burdensome discovery and

chilling of legitimate and beneficial product education and support for patients.  For this reason,

the United States does not intend to respond to all of the factual assertions by Relator and will

only focus on the most relevant ones.

### A.  Relator's Portrayal of NHCA Group is Inaccurate

Relator does not dispute the byzantine corporate structure utilized by the *qui tam*

investors of Venari Partners LLC to maintain their anonymity and conceal their role behind

"NHCA Group."  And although Relator bristles at the notion that NHCA Group is a professional

relator, that is exactly how Mr. Mininno previously described the organization on his public

Facebook profile:

> The group deploys to finance the operations of an experienced healthcare fraud
> management team seeking to uncover, investigate, develop and file high value
> whistleblower lawsuits.  Applying a proven and reproducible method, management
> intends to build a portfolio of cases that can generate substantial investor returns over
> 5 to 10 years.

Declaration of Colin M. Huntley ("Huntley Decl."), ¶ 24, Exhibit 2.[1]  Relator attempts to

discredit any reference to these facts by dismissing them as "*ad hominem* attacks" and "attacks

on Relator's character."  But these facts are germane for several reasons, including:

(1) explaining how the same allegations came to be copied across *qui tam* complaints filed

throughout New York, Massachusetts, Pennsylvania, Illinois, Washington, and Texas[2] in an

---

[1] The profile is no longer public and appears to have been deactivated or removed sometime
after June 7, 2018.

[2] The United States' opening brief identified 11 *qui tam* actions filed by NHCA Group involving
substantially the same allegations.  An additional case has since been unsealed in the Southern

effort to "generate substantial investor returns" for the *qui tam* investors; (2) informing the reliability of the information presented in the complaints; and (3) demonstrating that neither the relator entity nor the *qui tam* investors have personal knowledge or first-hand information of any kind relating to their allegations.[3]

Relator's attempts to recast NHCA Group as a *bona fide* "research organization" are similarly unpersuasive.  When the organization was profiled by *WIRED* magazine in March 2016, Mr. Mininno claimed that NHCA Group had filed "around 40 lawsuits," J.C. Herz, *Medicare Scammers Steal $60 Billion a Year.  This Man is Hunting Them.*, Wired, Mar. 7, 2016, *available at* https://www.wired.com/2016/03/john-mininno-medicare/ (last visited Feb. 6, 2019), and this figure does not include the 11 *qui tam* actions listed in the United States' opening brief. These facts speak for themselves, and the notion that NHCA Group had no idea the information collected would be used for litigation strains credulity, particularly given the organization's stated goal of using its "reproducible method" to "develop and file high value whistleblower lawsuits."  In this case, nearly all of the witnesses solicited for the fictitious "qualitative research study" were interviewed *after* NHCA Group had filed actions in Massachusetts, Pennsylvania, and New York alleging substantially the same conduct, including against some of the same

---

District of New York, *United States ex rel. Doe and APBQR, LLC v. Sanofi-Aventis U.S. LLC, et al.*, No. 16-cv-5107-NRB (S.D.N.Y.).  The case against *Sanofi-Aventis* has been dismissed, along with four of the other NHCA Group *qui tam* actions.  Six of the related NHCA Group actions remain pending, including this one.

[3] Relator objects to the use of the term "shell company" when referring to Relator Health Choice Group, LLC, and prefers the term "subsidiary."  *See* Relator's Response in Opposition to Motion to Dismiss (Dkt. 122) (Rel. Opp'n) at 7.  The descriptor is irrelevant; however, the United States notes that Health Choice Group LLC appears to have no employees or assets, no place of business, and no business operations (other than serving as Relator), and was incorporated only 10 days before this case was filed.

defendants.  In this case, as well, a witness appears to have been interviewed *after* the complaint was filed, and yet NHCA Group persisted with the pretext of "market research" and its claim of "no bias."[4]

Finally, in an effort to lend credibility to its "research" methods and bolster its "white coat marketing" kickback allegations, Relator exaggerates NHCA Group's role in prior, unrelated settlements.  For instance, Relator states:

> In a 2016 FCA action, Novo Nordisk paid approximately $60 million to resolve claims brought by whistleblowers that, among other improper activities, Novo Nordisk was paying kickbacks to induce healthcare providers to prescribe its products to patients. One method of carrying out this fraud was disguising sales reps as medical educators as part of a "white coat marketing" scheme and paying them kickbacks to persuade doctors to prescribe its products. Novo Nordisk's white coat marketing scheme was uncovered by whistleblowers, including two whistleblowers aided by NHCA, who brought a *qui tam* action that included years of the Group's research work into various marketing practices conducted by the drug industry.

Rel. Opp'n at 11-12; Mininno Decl. at ¶ 31.[5]  With this description, Relator implies that another pharmaceutical company paid $60 million to resolve AKS allegations very similar to the ones in this case.  But this is false— a review of the settlement agreement reveals that it resolved no AKS claims of any sort.  *See* Declaration of Colin Huntley ("Huntley Decl."), ¶25, Exhibit 3 at

---

[4]  Nor can Relator legitimize its tactics after the fact by insisting that it is standard practice to "blind" respondents.  In fact, the research manual cited by Relator appears to counsel against Relator's survey methodology.  *See* Shari S. Diamond, *Reference Guide on Survey Research, in Reference Manual on Scientific Evidence* 359, 410-411 (3d. ed. 2011) (explaining that it is "standard practice in surveys conducted for litigation to do <u>double-blind</u> research whenever possible" so the interviewer is blind to the sponsor of the survey and its purpose.) (emphasis added).

[5]  Mininno refers to this same settlement as a $40 million settlement in his supporting declaration filed in *United States ex rel. SMSPF, LLC v. EMD Serono, Inc., et al.*, No. 16-cv-5594 (E.D. Pa.).  Neither of these figures is correct – the company agreed to pay $46.5 million to resolve alleged FCA violations and separately agreed to disgorgement of $12.15 million for alleged violations of the Food, Drug, and Cosmetic Act (FDCA).

¶K (defining the "Covered Conduct" resolved by the settlement agreement).  Rather, the FCA recovery was based on entirely distinct allegations that the company failed to comply with the FDA-mandated Risk Evaluation and Mitigation Strategy (REMS) for a Type II diabetes medication and promoted the drug for individuals who did not have Type II diabetes.  *Id*.  The government neither intervened in nor settled the "white coat marketing" allegations, which were declined by the government and separately settled years later by the relator for $350,000, *see id*. at ¶26, Exhibit 4, a vastly lower sum than the $60 million now claimed by Relator.[6]

### B.  Relator Mischaracterizes the Government's Investigation

Equally unavailing is Relator's attempt to minimize the adequacy of the government's investigation and portray the United States' motion to dismiss as a product of "inertia of government lawyers." Rel. Opp'n at 6.

First, Relator notes that a Department of Justice attorney attended an interview of Relator's representative, Mr. Mininno, by videoconference and supposedly never inquired into the substance of the allegations in certain complaints.  *See* Rel. Opp'n at 24.  But relator omits key details, including that this September 2017 interview of Mr. Mininno included an Assistant U.S. Attorney, an Investigator from the U.S. Attorney's Office, two Investigative Analysts from HHS-OIG, and a Special Agent from the Defense Criminal Investigative Service, all of whom attended all or part of the interview in person.  *See* Declaration of Ann Williams ("Williams Decl.") at ¶3.  More importantly, Relator ignores that during the interview, Mr. Mininno

---

[6] This is an important data point because the "white coat marketing" and AKS claims in the Novo Nordisk *qui tam* that were settled for $350,000 are substantially the same allegations presented in this case, which Relator asserts are worth "hundreds of millions, if not billions, of dollars." Rel. Opp'n at 39. Also, to put the settlement figure in perspective, the Centers for Medicare and Medicaid Services estimates that it will cost more than $350,000 simply to collect Medicare claims data related to the NHCA Group cases.

conceded he had no personal knowledge concerning the allegations in the *qui tam* complaints discussed.  *See id*. at 5.  Thus, the lack of substantive discussion regarding the allegations was not due to the lack of diligence by government attorneys or investigators, but rather Mr. Mininno's own admitted lack of knowledge concerning the allegations that he hoped would "generate substantial investor returns."

Second, Relator claims that it "does not believe that the government investigated Relator's allegations," because the Department declined intervention only six weeks after interviewing Mr. Mininno.  *See* Rel. Opp'n at 24.  Relator surmises that it is "inconceivable" that the Department could have collected information or conducted an adequate investigation in only six weeks.  Yet again, Relator's recitation of events fails to tell the whole story.

It is ironic that Relator emphasizes the brevity of the government's investigation prior to declination given that Relator strenuously opposed the United States' request for additional time to investigate Relator's allegations.  In any event, by this point the United States had already spent considerable time investigating substantially the same allegations that NHCA Group had filed in several other districts, implicating some of the same defendants, the same legal issues, and the same industry practices.  More importantly, the Department continued to evaluate this particular *qui tam* action after it was declined.  In particular, as discussed more fully below, the government had extensive discussions with Relator about the allegations and supporting evidence.   Additionally, prior to seeking dismissal, the Department requested that Bayer voluntarily produce documents relating to the allegations, resulting in the collection of approximately 123,000 pages of documents, including commercial business plans and the relevant contracts entered into among defendants in this case.

## C. **Relator Mischaracterizes Its Discussions with DOJ**

Relator also mischaracterizes the extensive discussions between Relator's counsel and government counsel that were conducted at the request of NHCA Group after it was informed that the government had significant concerns regarding further litigation that counseled in favor of dismissal pursuant to section 3730(c)(2)(A).   Despite Relator's reference to a "48-hour ultimatum," the facts are far less dramatic.

The government accommodated multiple requests for telephonic and in-person meetings with various representatives of the Relator entities spanning approximately 10 weeks. *See* Huntley Decl., ¶¶ 3-23.[7]  Although Relator now complains about the United States' delay in filing its motion to dismiss, the Department delayed filing for over two months at Relator's request to afford Relator an extended opportunity to address the government's concerns about this and the other actions.   The parties' discussions of these concerns included a 90-minute meeting on October 18, 2018, in which the NHCA Group relators were represented by sixteen attorneys from nine different law firms, and a 60-minute telephone conference on November 6, 2018, in which Relator's counsel had an opportunity to discuss the case with the Assistant Attorney General for the Civil Division and a Deputy Associate Attorney General, among others. *See* Huntley Decl. at ¶¶ 7-9; 13-15.  While Relator asserts that government counsel "lacked a basic understanding of the allegations," and never suggested concern about the lack of merit or factual support, this is yet another mischaracterization. *See id*.  Indeed, Relator's own

---

[7]  Relator's response includes a 10-page attorney declaration that purports to characterize the numerous discussions and correspondence with Department of Justice counsel.  The government disagrees with many of these characterizations, but does not intend to provide a blow by blow rebuttal, as the parties' substantive discussions are not relevant to the Court's analysis of the Government's motion to dismiss, and the fact that Relator required ten-pages to recount these discussions in and of itself speaks volumes about the extent to which Relator was afforded an opportunity to present its views and supporting information to the government.

presentation "agenda" for the October 18 meeting lists discussion of the merits as one of the topics for that meeting.  *See* Huntley Decl. at ¶ 8, Ex. 1; ¶ 10.  Similarly, the suggestion that the government never discussed any HHS-OIG guidance with Relator is incorrect – during both the October 18 meeting and the November 6 teleconference, the parties discussed pertinent OIG guidance and how it bears on the case, including the ability to demonstrate the intent necessary to prove the predicate AKS violations upon which Relator's FCA claims are based.  *See* Huntley Decl. at ¶¶ 9, 14.

Notably, in addition to the parties' extended discussions, as well as multiple rounds of additional correspondence that Relator sent between October 26 and December 13, the government acceded to Relator's request that it be afforded the opportunity to provide supplemental information and examples of their best supporting evidence.  *See* Huntley Decl. at ¶¶ 15-16.  In sum, contrary to Relator's suggestions, Relator was provided with a substantial opportunity before the government moved to dismiss to address the government's concerns regarding further litigation.  The government carefully considered Relator's input, discussed it with counsel for the affected agencies, and concluded that Relator's litigation on behalf of the government was not in the public interest and should be brought to a close.

## II.  Relator's Legal Analysis Suffers from Numerous Deficiencies

In addition to the factual errors made in discussing NHCA Group and the government's investigation, Relator also advances a number of irrelevant or erroneous legal propositions. None of these arguments negates the conclusion that the government is entitled to substantial deference—either unfettered discretion or rational basis review—when exercising its dismissal authority, and that the government's balancing of interests in this case falls squarely within the broad authority delegated to it by Congress.

First, the Court need not assess the propriety of a corporate entity serving as relator or a corporation's ability to qualify as an "original source" for purposes of the FCA's public disclosure bar.  *See* 31 U.S.C. § 3730(e)(4) (authorizing dismissal of a *qui tam* action if the allegations were publicly disclosed and the relator does not qualify as an "original source").  The United States' motion to dismiss is not premised on relator's corporate form or the public disclosure bar, and the case law cited by relator on these issues is not relevant to the government's authority to dismiss this action under 31 U.S.C. §3730(c)(2)(A).

Second, Relator incorrectly claims that the instant motion is "unprecedented" in the "150 years" since the enactment of the FCA.  Rel. Opp'n at 1.  As an initial matter, section 3730(c)(2)(A) was only enacted in 1986, not "150 years" ago.  More importantly, in the three decades since enactment, there have been numerous instances in which courts have granted motions to dismiss that were filed at far more advanced stages of the litigation.  *See, e.g.*, *Sequoia Orange Co.*, 151 F.3d at 1143 (granting government's motion to dismiss filed "several years after the litigation began"); *see also United States ex rel. Wright v. Agip Petroleum Co., et al.*, No. 5:03-cv-00264-MHS-CMC (E.D. Tex. Feb. 2, 2005) (granting government's motion to dismiss filed more than eight years after *qui tam* filed and more than four years after declination-in-part); *United States ex rel. Piacentile v. v. Amgen Inc., et al.*, No. 04-cv-3983, 2013 WL 5460640, at *1-3 (E.D. Pa. Sept. 30, 2013) (granting government's motion to dismiss filed more than nine years after action commenced); *United States ex rel. Stierli v. Shasta Services, Inc.*, 440 F. Supp. 2d 1108, 1115 (E.D. Cal. 2006) (granting government's motion to dismiss filed after close of discovery while cross-motions for summary judgment were pending).

Third, Relator misapprehends both the D.C. Circuit's decision in *Swift* and the Ninth Circuit's decision in *Sequoia Orange*.  For the reasons set forth in the United States' opening

brief, the government respectfully suggests that *Swift's* unfettered discretion standard is the appropriate one for evaluating the government's motion to dismiss.  In any event, Relator's attempt to avoid the application of either standard in this case is unavailing.

Relator incorrectly asserts that *Swift* is "completely inapposite" "[b]ecause Relator is not attempting to force the United States to prosecute a trivial claim against its will."  Rel. Opp'n at 39.  The United States did not prosecute the claim in *Swift* any more or less than it is prosecuting the claim in this case: in both actions the relator was proceeding in the name of the United States and the United States determined that such a claim should not proceed.  Indeed, the D.C. Circuit in *Swift* never mentioned the concept of "forced prosecution," and instead grounded its unfettered discretion standard in the Government's broad authority to dismiss cases brought "in the name of the United States."  *Id.* at 254 ("Nothing in §3730(c)(2)(A) purports to deprive the Executive Branch of its historical prerogative to decide which cases should go forward in the name of the United States.").  And if there were any doubt about Relator's constrained interpretation of *Swift*, it is eliminated by the D.C. Circuit's decision in *United States ex rel. Hoyt v. American Nat'l Red Cross*, 518 F.3d 61, 65 (D.C. Cir. 2008), where the court reaffirmed the United States' "unfettered right" to dismiss a declined *qui tam* without any of the conditions or limits Relator suggests.  Finally, Relator ignores the Fifth Circuit's *en banc* decision in *Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749 (5th Cir. 2001) (*en banc*).  There, using language reminiscent of the D.C. Circuit in *Swift*, the court acknowledged the Executive's "extraordinarily wide discretion" in deciding whether to prosecute and cited section 3730(c)(2)(A) for the proposition that "the government retains the *unilateral* power to dismiss an action notwithstanding the objections of the [relator]."  252 F.3d at 753 (emphasis added).

With regard to *Sequoia Orange*, Relator incorrectly dismisses it as "provid[ing] no meaningful guidance" because the government in that case conceded the case had merit.  Rel. Opp'n at 40.  But the dismissal of claims in that case despite the government's stipulation of merit gives the Ninth Circuit's decision greater force in this case, not less.

Relator also misconstrues *Sequoia Orange* as requiring the government to make an "evidentiary showing" to disprove the merit of the allegations before dismissing this action pursuant to section 3730(c)(2)(A).  *See* Rel. Opp'n at 40-41.  Numerous courts applying *Sequoia Orange*, however, have held that the potential merit of a *qui tam* action is insufficient to overcome a motion to dismiss under section 3730(c)(2)(A).  *See, e.g., United States ex rel. Wickliffe v. EMC Corp.*, 473 Fed. App'x 849, 854 (10th Cir. 2012) ("[T]he the potential merit of a *qui tam* action is insufficient to overcome the government's rational reasons for dismissing the suit."); *United States ex rel. Toomer v. TerraPower, et al.*, No. 4:16-cv-00226, 2018 WL 4934070, \*5 (D. Id. Oct. 10, 2018) (explaining that the court "need not address the viability of [relator's] claims" because the Court can dismiss the claims "even if they are viable").  While Relator relies on the Ninth Circuit's statement that "a meritorious case may be dismissed upon a proper showing," *Sequoia Orange Co.*, 151 F.3d at 1144 (citing S. Rep. No. 99-345, at 25-26), Relator fails to note that the Senate Report cited by the Ninth Circuit discussed a preliminary version of section 3730(c)(2)(A) that was <u>not</u> enacted.  *See Swift*, 318 F.3d at 253.  More importantly, the legislative history for the unenacted provision explicitly rejected the notion that evidentiary hearings should be required and explained that they should be available only in the limited circumstances where a relator makes a "substantial and particularized need" for a hearing.  S. Rep. 99-345, at 26 (1986); *see also United States ex rel. Wickliffe*, 473 Fed. App'x. at 854 (explaining that an evidentiary hearing is not necessary for relator to address his

12

disagreement with the United States' proffered reasons for dismissal, which can be addressed at oral argument); *United States ex rel. Nicholson v. Spigelman*, No. 10-cv-3361, 2011 WL 2683161, at *6 (N.D. Ill. July 8, 2011) (rejecting relator's assertion that an evidentiary hearing was required, an argument the Court called "patently wrong" in light of the legislative history).

Relator's argument that it is entitled to an "evidentiary showing" also relies erroneously on the law of the case doctrine.  Contrary to Relator's suggestion, the Court has made no final merits determination, nor have Relator's allegations been "held to have merit," Rel. Opp'n at 39.  Rather, the Court has held only that Relator's allegations were plausibly alleged after accepting all allegations as true and drawing all inferences in Relator's favor.  This decision at the pleading stage is hardly a determination of the merits, particularly given that the claims were nonetheless dismissed on account of Relator's failure to plead its allegations with the particularity required by Fed. R. Civ. P. 9(b).  As such, the partial denial of Defendants' motion to dismiss has no preclusive effect on the United States' motion to dismiss, which is based on a separate and unrelated legal issue, and consideration of, among other things, Relator's ability to prove not just plead its allegations.  *Cf. Wyble v. Gulf South Pipeline Co., L.P.*, 308 F. Supp. 2d 733, 745 (E.D. Tex. 2004) (rejecting plaintiff's assertion that the denial of a motion to dismiss established "law of the case" for separate, unrelated issues relating to plaintiff's standing to pursue injunctive relief); *Gould v. United States*, 66 Fed. Cl. 253, 266 (2005) ("The 'law of the case,' therefore is that these allegations survive a motion to dismiss for failure to state a claim upon which relief can be granted. Whether the merits of those very same claims survive summary judgment is an entirely different and undecided matter.").

Here, Relator has made no showing that the government's motion to dismiss is "fraudulent, arbitrary and capricious, or illegal." *Sequoia Orange Co.*, 151 F.3d at 1145.  At

13

most, Relator's objections boil down to differences of opinion regarding the government's cost-benefit analysis and certain policy and enforcement prerogatives.  Such differences of opinion, no matter how strongly held, fall far short of carrying Relator's burden of overriding the Government's broad discretion to dismiss or obtaining an evidentiary hearing. *See, e.g., United States ex rel. Stovall v. Webster Univ.*, No. 3:15-CV-03530-DCC, 2018 WL 3756888, at *3 (D.S.C. Aug. 8, 2018) (granting government's motion to dismiss despite relator's claim that "anticipated financial gain outweighs the anticipated time and money to be expended" by the United States); *United States ex rel. Toomer*, 2018 WL 4934070, at *5 ("In essence, [relator] disagrees with the government's priorities.  This disagreement is insufficient to establish that the government's reasons for seeking dismissal are invalid."); *United States ex rel. Nicholson*, 2011 WL 2683161, at *2 (rejecting relator's claim that the government "seriously underestimated the financial upside of the litigation," explaining, "[t]he government's cost-benefit analysis may be sound or it may be short-sighted, but it cannot be deemed arbitrary and capricious."); *see also Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) (stating that an agency is "better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities" and to evaluate its available resources).[8]

---

[8]  Relator makes a passing reference to potential "bias" of government officials affecting the United States' dismissal decision, citing the fact that the Secretary of HHS is a former senior executive of a pharmaceutical company that is a defendant in *United States ex rel. Health Choice All'nce, LLC v. Eli Lilly & Co., et al.,* No. 5:17-cv-123 (E.D. Tex.).  Relator offers no support for this speculation, and courts have rightly rejected such speculation in similar contexts.  *See, e.g., United States ex rel. Nasuti v. Savage Farms, Inc.*, No. 12-cv-30121, 2014 WL 1327015, *11-12, (D. Mass. March 27, 2014) (Report and Recommendation) (rejecting relator's "unsupported speculation" concerning "political connections" playing a role in government's dismissal decision), *aff'd* 581 Fed. App'x. 904 (1st Cir. 2014).  In any event, the recommendation to dismiss this action was made by career attorneys from the Department of Justice in consultation with career attorneys from HHS-OIG.

14

Nor is Relator entitled to discovery concerning the United States' investigation, deliberations, or confidential communications with agency counsel.  As one court recently explained, "[t]he FCA does not expressly entitle the objecting *qui tam* relator to discovery at all," and therefore, allowing a relator to conduct discovery into the government's reasons for dismissal "is generally antithetical to the government's prerogative to end a *qui tam* case brought in its own name." *United States ex rel. Toomer,* 2018 WL 4934070, at *6 (quoting *United States v. Everglades Coll., Inc.*, 855 F.3d 1279, 1291 (11th Cir. 2017)).  The recent decision in *Toomer* is instructive.  Applying the *Sequoia Orange* standard, the court rejected relator's request to conduct discovery regarding the adequacy of the government's investigation or whether it had considered "arbitrary or improper factors" in moving for dismissal.  *Id.  See also United States ex rel. Nicholson,* 2011 WL 2683161, at *3 (rejecting relator's request for discovery because permitting the relator to conduct discovery would "allow what the Government was trying to avoid in moving to dismiss the action—costly and time consuming. . . discovery" (citation omitted)); *United States ex rel. Schweizer v. Oce North America, Inc.*, 956 F. Supp. 2d 1, 9 (D.D.C. 2013) (rejecting relator's request for discovery into government's dismissal decision because it "would risk transforming the § 3730(c)(2)(A) hearing into a trial on the merits of plaintiff's claims and the government's estimations of the litigation risks."); *cf. Everglades Coll.,* 855 F.3d at 1290 (affirming the district court's denial of relator's request for discovery and evidentiary hearing in the arguably less deferential context of 31 U.S.C. § 3730(c)(2)(B)) where the government seeks to settle claims over relator's objection).  Here, too, Relator is not entitled to add to the very discovery burden that the government seeks to end.

Finally, while section 3730(c)(2)(A) affords the Relator a hearing on the United States' motion, the government agrees with the numerous courts that have held that the purpose of such

a hearing "is simply to give the relator a formal opportunity to convince the government not to

end the case." *Swift*, 318 F.3d at 253; *see also United States ex rel. Nasuti,* 2014 WL 1327015,

at *13.  Moreover, a number of courts have held that no hearing is required at all if relator has

been afforded an adequate opportunity through written briefing to persuade the United States not

to dismiss the action.  *See United States ex rel. May v. City of Dallas*, No. 3:13-cv-4194-N-BN,

2014 WL 5454819, *4 (N.D. Tex. Oct. 27, 2014); *Nicholson*, 2011 WL 2683161, at *3; *United*

*States ex rel. Pentagen Techs. Int'l Ltd. v. United States*, No. 00-CIV-6167-DAB, 2001 WL

770940, at *7 n.13 (S.D.N.Y. July 10, 2001).  In this particular case, though ultimately

unsuccessful, there can be no doubt that Relator has already been afforded multiple opportunities

to present its views and arguments to the government.

## CONCLUSION

Having failed in its efforts to persuade the government not to dismiss, Relator now urges

the Court to second-guess the government's investigation, conclusions, and policy prerogatives,

thereby illustrating the very separation of powers concerns that undergird both *Swift* and *Sequoia*

*Orange*.  The Court should decline the invitation to do so, and for the reasons set forth above, as

well as in the government's motion to dismiss, the United States respectfully requests that the

Court grant its motion pursuant to 31 U.S.C. § 3730(c)(2)(A).


Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General,
Civil Division

JOSEPH D. BROWN
United States Attorney

Dated:  February 19, 2019          By:  /s/ *James G. Gillingham*

JAMES G. GILLINGHAM
Assistant U.S. Attorney
Eastern District of Texas
110 N. College Street; Suite 700
Tyler, Texas 75702
E-mail: James.Gillingham@usdoj.gov
(903) 590-1400
(903) 590-1436 (fax)
Texas State Bar # 24065295

JOSHUA M. RUSS
Assistant U.S. Attorney
Eastern District of Texas
101 East Park Blvd., Suite 500
Plano, Texas 75074
E-mail: Josh.M.Russ@usdoj.gov
(972) 509-1201
(972) 509-1209 (fax)
Texas State Bar # 24074990

MICHAEL D. GRANSTON
EDWARD C. CROOKE
COLIN M. HUNTLEY
BRIAN J. McCABE
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
202-616-4875
202-616-3085 (fax)
Brian.McCabe@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

 I certify that on this 19th day of February 2019, I caused this document filed through the ECF system to be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.


      /s/ *James G. Gillingham*
     JAMES G. GILLINGHAM