**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

|  |  |
|---|---|
| HEALTH CHOICE GROUP, LLC and JAIME GREEN, on behalf of the UNITED STATES OF AMERICA, et al.,<br><br>      Plaintiffs/Relators,<br><br>v.<br><br>BAYER CORPORATION, et al.,<br><br>      Defendants. | Civil Action No.: 5:17-CV-126-RWS-CMC<br><br><br>**RELATOR'S SUR-REPLY IN RESPONSE TO THE UNITED STATES' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |

4829-6501-3897

TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................1

II.    ARGUMENT.........................................................................................................3

      A.    The Government's Continued Attacks on Relator Are
             Inaccurate and Irrelevant.........................................................................3

      B.    The Government's Motion Fails under Any Standard of
             Review .......................................................................................................6

            1.    The Government's Motion Fails the *Swift* Standard...................6

            2.    The Government's Motion Fails the *Sequoia
                  Orange* Standard ........................................................................10

III.    CONCLUSION...................................................................................................15

4829-6501-3897

## TABLE OF ABBREVIATIONS

| Abbreviation | Term |
| --- | --- |
| AKS | Anti-Kickback Statute |
| DOJ | Department of Justice |
| FCA | False Claims Act |
| Health Choice or Relator | Health Choice Group LLC |
| Lelutiu Decl. | January 22, 2019 Declaration of Radu A. Lelutiu |
| Lelutiu Surreply Decl. | March 4, 2019 Declaration of Radu A. Lelutiu |
| Mininno Decl. | Declaration of John Mininno |
| Mininno Surreply Decl. | March 4, 2019 Declaration of John Mininno |
| MTD | The United States' Motion to Dismiss (D.I 116) |
| NHCA | NHCA Group |
| Opp. | Relator's Response to MTD (D.I. 122) |
| R&R | June 29, 2018 Report and Recommendation of the United States Magistrate Judge (D.I. 91) |
| Reply | The United States' Reply (D.I. 131) |
| SAC | Second Amended Complaint |

4829-6501-3897

## I.    INTRODUCTION[1]

The reply boils down to the proposition that the Court should trust DOJ and rubber-stamp the government's pro-forma motion because the Executive Branch has an absolute right to decide (i) what Congress meant when it enacted the AKS; (ii) how federal courts should interpret that statute; and (iii) whether taxpayers are entitled to combat fraud as they have done for over 150 years.  But, as Relator explained, that is not and cannot be the law.  The meaning and scope of federal statutes—and the merits of complaints alleging violations thereof—are matters the Constitution has entrusted to the federal courts, not the Executive Branch.  *Marbury v. Madison*, 5 U.S. 137, 177 (1803).  And, consistent with the framework of the Constitution, the Executive Branch may not suspend the federal courts' role in determining the boundaries of the AKS in a way that is predictable, principled, and reasoned.   Ultimately, however, to resolve the government's motion, the Court need not tackle any constitutional questions.  This is because the reply confirms that, in moving to dismiss, the government has misrepresented the nature and scope of its supposed "investigation" of Relator's allegations and, in the process, attempted to mislead the Court.

Let's consider the record.  In its motion, the government asserted that its October 2017 declination decision "in *this* case" was preceded by an "*extensive* investigation" involving "the collection and review of *tens of thousands of documents* from *the defendants* and third parties and interviews of numerous witnesses, including prescribing physicians."  MTD at 7, 14.  We now know that these assertions were inaccurate.   That is, during its six-week purported "investigation," the government appears not to have collected a single document from "the *defendants*."  *See* Opp. at 24.  And the government's investigation of "this case" certainly could

---

[1] Unless otherwise noted, emphases are added.

4829-6501-3897

not have entailed the collection and review of "tens of thousands of documents" produced by "the defendants."  MTD at 14.  This is because, after 16 months of litigation and faced with a Discovery Order that required the production of "*all*" relevant documents within 45 days of the scheduling conference (D.I. 62 ¶ 3(a)), Relator is yet to receive from Bayer and its co-Defendants discovery that comes close to the "tens of thousands of documents" the government supposedly obtained, reviewed, and digested in a matter of weeks.  Lelutiu Surreply Decl. ¶ 2.

It is important to take a step back and consider what the government has asked the Court to do.  After sitting on the sidelines for 14 months, no-showing every significant event in this litigation, and registering no objection to Judge Craven's conclusion that Relator's allegations clear Rule 12(b)(6)'s pleading standards, the government has sided with Big Pharma and demanded that the Court rubberstamp a with-prejudice dismissal order that will wreak havoc in the healthcare marketplace and effectively legalize the types of kickbacks Relator is seeking to curb.  What's more, the government's motion is expressly premised on factual representations that Relator has now debunked.  The Court should reject these tactics and deny the government's motion.

The government's secondary arguments that dismissal is appropriate because the government has articulated a rational interest it is allegedly seeking to further—avoiding "burdensome discovery and chilling of legitimate and beneficial product education and support for patients" (Reply at 3)—are similarly unavailing.  Because they are based on a misrepresentation of Relator's allegations, these alleged concerns are hypothetical and hyperbolic.  Indeed, the motion to dismiss expressly tied them to the government's supposed conclusion that, based on the government's fictitious investigation, Relator's claims lack "factual and legal" support—a conclusion that is barred by the law of the case doctrine.  Furthermore,

4829-6501-3897

absent from the motion is any evidence that outsourcing patient care to Big Pharma, as Defendants have done through the conduct Relator challenges, leads to safer or more cost-effective care for chronically-ill patients.  And, in any event, under the analytical framework set out in *United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp*., 151 F3d 1139 (9th Cir. 1998), the motion still fails because Relator has demonstrated that the government's decision to move to dismiss Relator's meritorious claims is "arbitrary and capricious."

To ensure that the government's actions and representations receive appropriate scrutiny, Relator respectfully reiterates its request for a hearing.  The matters at issue in this litigation are of utmost importance to the public and, despite the government's suggestions to the contrary, Relator is statutorily entitled to a hearing.

## II.    ARGUMENT

### A.    The Government's Continued Attacks on Relator Are Inaccurate and Irrelevant

The government asserts that it "does not intend to respond to all of the factual assertions" Relator set out in its opposition, and instead "only focus on the most relevant ones."  Reply at 3. The government then proceeds to double-down on irrelevant and inaccurate attacks on Relator and Mr. Mininno.  These sideshows continue to miss the mark.

Its fixation on vilifying NHCA notwithstanding, the government does not dispute any of the key facts Relator set out in its opposition.  Here they are again: (i) NHCA has uncovered scores of fraudulent schemes; (ii) to bring the perpetrators of healthcare fraud to justice, the government has routinely partnered with NHCA—and embraced NHCA's investigative techniques; and (iii) the government's partnership with NHCA has resulted in significant

4829-6501-3897

enforcement efforts and sizeable recoveries for taxpayers.[2]  *See* Opp. at 7-13; Mininno Decl. ¶¶ 14-32.  Notably, since Relator filed its opposition to the government's motion to dismiss, the government has resolved two additional *qui tam* cases that were investigated and brought to the attention of DOJ attorneys by NHCA and individual relators.  Mininno Surreply Decl. ¶¶ 3-4.  And, ironically, in DOJ-issued press releases announcing the resolution of these matters, the government heaped praise on the relators'—and thus NHCA's—"invaluable contribution[s]" to the enforcement efforts.  *Id.*  The government also noted that, "[w]ithout information from citizens like the relator, detecting fraud and conserving government program funds would be far more difficult."

The government's cursory attacks on NHCA's investigative and research protocols similarly fail to persuade.  In a footnote, the government asserts that "the research manual cited by Relator appears to counsel against Relator's survey methodology" of "blinding" respondents.  Reply at 5 n.4.  False.  The *Reference Guide on Survey Research* does recommend that surveys be conducted in "double-blind" fashion, such that neither the interviewers nor the respondents are made aware of the purpose behind the survey.  But a "*double*-blind survey" by definition entails the "blinding" of respondents—the very practice the government asserts was deceptive.  The fact that NHCA's representatives were not "blinded" during interviews is irrelevant because they were following a standardized questionnaire and merely recording the respondents' answers in verbatim fashion.  And, in any event, as precedent Relator cited in the opposition demonstrates, the principal purpose of the "blinding" procedure is to prevent *respondent* bias,

---

[2] The government asserts that Relator has "exaggerate[d]" NHCA's role in "prior, unrelated settlements."  Reply at 5.  Not so.  The fact that the Novo Nordisk *qui tam* litigation included a variety of claims, and not just "white coat marketing," does not negate NHCA's role in bringing Novo Nordisk to justice.  And, in any event, the $350,000 that Novo Nordisk paid to settle its "white coat marketing" misconduct is hardly a pittance.

4829-6501-3897

and "double blinding" is not in fact required.  *See, e.g.*, *Payton v. Entergy Corp.*, 2013 U.S. Dist. LEXIS 150824, at \*18-19 (E.D. La. Oct. 21, 2013) ("The function of [the 'blinding'] procedure is to prevent bias from impacting the survey.  In other words, it is to prevent respondents from giving the answer that they think the interviewer wants to hear.").

Equally unavailing are the government's charges that NHCA's "investors" hid behind a "corporate structure" and Relator "copied" the SAC from complaints NHCA affiliates filed in other jurisdictions.  Reply at 3, 1.  These assertions may make for good press headlines, but they are simply untrue.  As an initial matter, Mr. Mininno has worked transparently with the government for years—and, indeed, the government acknowledged NHCA's corporate structure in an April 2018 pleading.  *See* Opp. at 12.  Furthermore, as Mr. Mininno explained in his declaration, NHCA operates through LLCs for a whole host of legitimate reasons, including to ensure compliance with the FCA's seal provisions.  Mininno Decl. ¶ 11.  The government's talk of "cloned" and copycat complaints are likewise untrue.  The SAC was based on Relator's investigation of *Bayer's* and its co-Defendants' marketing activities—a process that lasted months and entailed numerous interviews of individuals with knowledge of and involvement in the schemes.  *See* SAC ¶¶ 83-87.  Unsurprisingly, because NHCA was involved in preparing all complaints filed by its affiliates and, to some extent, the challenged practices overlap between cases, the overall structure of the different pleadings is similar across the complaints.  Mininno Decl. ¶ 26.  But the "who, what, when, where, and how" for each fraud were individually investigated, and Relator's allegations in this case reflect hundreds of hours of work Relator's representatives prepared to unmask the particular fraudulent schemes detailed in the SAC—not

4829-6501-3897

schemes at issue in any other litigation.[3]

\*       \*       \*

At bottom, the government's attacks on Relator, NHCA, and Mr. Mininno are a smokescreen designed to distract from the single "most relevant" fact here (*see* Reply at 3)—that the government has not identified any inaccuracies in Relator's allegations.

## B.      The Government's Motion Fails under Any Standard of Review

The centerpiece of the government's motion was the assertion that, before its declination decision 16 months ago, the government conducted an "*extensive* investigation" into Relator's allegations in "*this* case" and found them to lack merit.  MTD at 7, 14.  This assertion has been thoroughly debunked and, since it is based on numerous misrepresentations, the government's motion fails under any standard of review.

### 1.      The Government's Motion Fails the *Swift* Standard

Even if the Court were to adopt the deferential standard the government has urged, the motion to dismiss still fails.  This is because *Swift v. United States*, 318 F.3d 250 (D.C. Cir. 2003), authorizes judicial review in circumstances that amount to, among other things, a "fraud on the court."  *Id.* at 253.  The record here compels the conclusion that, in moving to dismiss this case, the government has sought to mislead the Court by misrepresenting the nature and scope of its supposed "investigation" into Relator's allegations "in this case."  Standing by itself, this malfeasance warrants denial of the government's motion.

There can be no doubt that the October 2017 declination decision was preceded by no meaningful investigation, and that the government's contrary representations (*see* MTD at 7, 14)

---

[3] The use of a common template to prepare similar litigation filings is hardly an untoward practice.  To the extent the government contends otherwise, it may wish to compare the motions to dismiss and reply it filed in this action to those it filed in the *Lilly* matter.

6

were designed to deceive the Court and the public.  Because it failed to serve a single discovery request on Bayer and its co-Defendants, the government could not have collected "tens of thousands of documents" from "*the defendants*."   And, in a matter of weeks, Bayer and its co-defendants could not have produced "tens of thousands of documents" to the government because, after 16 months of litigation, Bayer and its co-Defendants have turned over to Relator fewer than 9,000 documents.  Lelutiu Surreply Decl. ¶ 2.

Importantly, while the government has submitted two additional declarations with its reply, neither provides *any* support for the government's representations concerning its investigation.  Ms. Williams's declaration discusses events that occurred on a single day, *i.e.*, the September 2017 Relator interview.  And the chronology set out in Mr. Huntley's declaration begins on October 3, 2018—the very day when the government announced its plan to dismiss this action.  It is telling that, presented with an additional opportunity to back up representations it had previously made to the Court, the government opted not to do so.

Unable to defend its representations to the Court, the government now suggests that, when it touted its "extensive investigation" of Relator's factual allegations "in *this* case" (MTD at 7, 14), the government was really referring to supposed investigations of *other cases* filed by NHCA affiliates against defendants *other than Bayer*.[4]  The government's attempt to walk back its previous representations only underscores that they were intended to mislead the Court to rubber-stamp the government's motion.  Again, this is what the government told the Court: "[a]fter concluding that relator's allegations *in this case* lacked sufficient factual and legal support, *as in the other actions,* the United States notified the Court on October 30, 2017 that it

---

[4] *See* Reply at 7 ("In any event, by this point the United States had already spent considerable time investigating substantially the same allegations that NHCA Group had filed in several other districts implicating some of the same defendants, the same legal issues, and the same industry practices.").

4829-6501-3897

was declining to intervene." MTD at 7.  Furthermore, the government cannot seem to get its story straight.   In a pleading filed in the U.S. District Court for the Eastern District of Pennsylvania, signed by some of the same DOJ attorneys who signed the motion and reply, the government continues to maintain that each one of the NHCA cases was in fact *independently investigated*, and that "attorneys across *eight* U.S. Attorneys' Offices *all* reached the same conclusion that the allegations lack sufficient factual and legal support."  Lelutiu Surreply Decl. Ex. A at 1.  The government's ever-changing account of the nature of its supposed investigation is telling.

The government notes that it is supposedly "ironic" that Relator "opposed the United States' request for additional time to investigate Relator's allegations," and then attempts to blame Relator "for *the brevity* of the government's investigation." Reply at 7.  There is no irony here.  If the government did not have enough time to investigate Relator's allegations, it should not have represented that it did so—let alone that its investigation was "extensive."

Equally unavailing is the government's attempt to pivot to interactions it had with Relator's counsel *after* the government had already announced its decision to move to dismiss. Reply at 7.  As it turns out, the government's "extensive discussions with Relator" (*id.*) were nothing but a charade intended to create an after-the-fact record of supposed diligence on the government's part.  Here too, the record is irrefutable.  Shortly before the Thanksgiving holiday, the government demanded that Relator provide various "evidence" for the government to consider, and directed Relator submit a response by November 30, 2018.  *See* Lelutiu Decl. ¶ 28. But before even receiving Relator's lengthy responsive submission, the government was already hard at work preparing its motion to dismiss.  *See* MTD at 5, 6 (referencing webpages the government "visited" on November 26, 2018, four days before Relator made a 100-page

8

submission to the government). And, lest that there be any misunderstanding that the outcome of the government's supposed dialogue with Relator's counsel was always preordained, after filing its motion to dismiss, the government (through Mr. Huntley) informed counsel for Relator that the government's "agreem[ment] to continue to refrain from filing any motions to dismiss" was merely a "*courtesy*" the government extended to Relator "to provide . . . additional information" to the government. Lelutiu Surreply Decl. ¶ 4.

The government notes that, "*prior to seeking dismissal*, [DOJ] requested that Bayer voluntarily produce documents relating to the allegations, resulting in the collection of approximately 123,000 pages of documents, *including commercial business plans and the relevant contracts entered into among defendants in this case*." Reply at 7. The fact that government collected these materials *after* it had already decided that it would move to dismiss this action speaks volumes about the nature of the government's investigation. And the fact that, before deciding to dismiss the SAC, DOJ attorneys had not even reviewed the Bayer contracts that resulted in the schemes at issue, underscores Relator's contention that, throughout its dialogue with Relator's counsel, DOJ lawyers lacked the most basic understanding of Relator's allegations.[5] It is also noteworthy that a significant portion of the 123,000 pages of documents

---

[5] *See* Lelutiu Decl. ¶¶ 17-18 ("It was evident during this [October 18, 2018] meeting that the government lacked a basic understanding of the allegations set out in the SAC. For instance, one of the government's lawyers asked Relators' counsel to explain how information patients received from Bayer- or Lilly-compensated nurses differed from information patients might receive by calling the '800' number listed on an FDA-approved label. In light of the SACs' allegations, which make clear that Bayer- and Lilly-compensated nurses were involved in the provision of actual medical care, this question made little sense. . . . The same lawyer also indicated that, because the government believed that Bayer's and Lilly's competitors were engaged in similar-type conduct, the government was skeptical that the challenged conduct drove prescriptions for Bayer and Lilly products. This assertion also suggested that the government had not taken the time to study Relators' allegations. For instance, the Bayer SAC alleges that the programs at issue were a "pillar" of Bayer's marketing strategy, and that Bayer consistently targeted high-volume prescribers. Likewise, the Lilly SAC alleges that the programs at issue

9

4829-6501-3897

the government is referencing were produced to Relator (and presumably, the government) on January 20, 2019—*four weeks after the government had already moved to dismiss.*  Lelutiu Surreply Decl. ¶ 2.

No amount of misdirection and deflection can change the record.  By touting a fictitious "extensive investigation" in "*this* case" and a non-existent collection of "tens of thousands of documents from *the defendants*," the government has sought to mislead the Court.  Thus, even considered under the deferential *Swift* standard, the motion should be rejected because it is predicated on an attempt to deceive the Court.

### 2.   The Government's Motion Fails the *Sequoia Orange* Standard

The government's motion also fails the standard of review set out in *United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F3d 1139 (9th Cir. 1998).  The *Sequoia Orange* framework requires, in the first instance, the United States to (i) identify a "*valid* government purpose" for dismissing the case, and (ii) show a "rational relationship between dismissal and accomplishment of the purpose." *Id.* at 1145 (quotations omitted). If the United States satisfies this two-step test, "the burden switches to the relator to demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal." *Id.*  The government has failed to proffer a "valid" reason for dismissal, and, even if it had, Relator has demonstrated that, in moving to dismiss, the government acted in "arbitrary and capricious" fashion.

### a.   The Government Has Failed to Identify a *Valid* Government Purpose for Dismissal

In its reply, the government indicates that the "purpose" for dismissing the case is the

---

were intended to and did result in a "reduction in barriers to prescribe" Lilly's products."); *id.* ¶ 26 ("During this teleconference, the government's lawyers made additional comments that appeared to Relators' counsel to reflect some significant misunderstandings concerning Relators' allegations.").

4829-6501-3897

government's desire to avoid "burdensome discovery and chill[] legitimate and beneficial product education and support for patients."  Reply at 3.  This assertion fails for numerous reasons.  As an initial matter, the government's motion expressly tied these supposedly "rational reasons" to the now-debunked premise of the government's argument for dismissal—the government's view that Relator's claims "lack sufficient factual and legal support."  Here is what the government wrote:

> In this case dismissal is appropriate because it is rationally related to the valid governmental purposes of preserving scarce government resources and protecting important policy prerogatives of the federal government's healthcare programs. . . . *[B]ased on its extensive investigation* of all of the various Venari Partner complaints, the government has concluded that the relators' allegations lack sufficient factual and legal support.  . . . .
>
> *As a result*, the government has concluded that further expenditure of government resources is not justified.

MTD at 14-15.  Because it assumes the premise of its argument, *i.e.*, that Relator's "allegations lack sufficient factual and legal support," the government's invocation of a "valid purpose" for dismissal collapses.  Importantly, the government does not contend that, if Relator's claims do indeed have merit, allowing this litigation to proceed would result in a supposed waste of government resources.

Furthermore, the government's contention that Relator's claims lack support is barred by the law of the case doctrine, as Relator demonstrated in its opposition.  *See* Opp. at 40.  In reply, the government asserts that the law of the case doctrine does not apply because the motion to dismiss is "based on a separate and unrelated legal issue" than those already settled by the Court.  Reply at 13.  The government is mistaken.  Again, the motion expressly turns on the government's contention that the SAC lacks "merit."  But that is the very matter the Court resolved when it adopted Judge Craven's R&R, which held that Relator's allegations concerning

4829-6501-3897

the Free Nurse and Support Services programs "adequately pleaded [that] Defendants set up a system whereby physicians received something of independent value if they prescribed the Covered Products" and, "[a]t a minimum, the[se] allegations raise a question as to whether the free nurse and reimbursement support provided by Defendants eliminated a substantial expense Prescribers would otherwise have had to incur."   Opp. at 4 (quoting R&R).   While the government is correct that the Court's denial of Defendants' motion to dismiss does not bar post-discovery, *summary judgment* challenges to Relator's claims (*see* Reply at 13), this overlooks that the government's motion is one to dismiss, not one for summary judgment.

The government's secondary contention that, allowing this case to be resolved on the merits, may "chill[] legitimate and beneficial product education and support for patients" (Reply at 3) is equally unavailing.  As Relator demonstrated in its opposition (*see* Opp. at 15-16, 22-23), the conduct at issue in the SAC extends well beyond "product education and support for patients," and, as the Court has already found, Relator has "adequately pleaded" that Defendants have violated the AKS.  *See* Opp. at 4 (quoting R&R).  The government's desire to dismiss well-pleaded AKS violations—and thereby create a gaping hole in this important statute—does not further a "*valid*" government interest.

### b.      The Motion to Dismiss Should Also Be Denied Because It Reflects "Arbitrary and Capricious" Conduct

Even if the government had identified a "valid" interest it is seeking to protect, the motion still fails because the government's motion is plainly the result of an "arbitrary and capricious" action.  This conclusion is compelled by numerous considerations.

As an initial matter, the fact that the government's motion is anchored in conclusory and unsupported assertions is sufficient reason for the Court to deny the motion.  Courts cannot perform their constitutionally required duty of ensuring that agencies act within permissible

political and legal bounds without an account of how the agency in fact conducted itself.  As a result, the existence of a "complete administrative record" is a necessary component of any defensible agency action and, conversely, the absence of such a record counsels in favor of a finding that the agency acted arbitrarily.  *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971); *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990) ("*Overton Park* suggests that [the APA's arbitrary and capricious standard] imposes a general 'procedural' requirement of sorts by mandating that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale . . ."); *NAACP v. Trump*, 298 F. Supp. 3d 209, 215-16 (D.D.C. 2018) ("the Court further concludes that . . . [the agency's decision] was arbitrary and capricious because the Department failed adequately to explain its conclusion that the program was unlawful.  Neither the meager legal reasoning nor the assessment of litigation risk provided by [Department of Homeland Security] to support its rescission decision is sufficient.").  The government's conscious decision *not to explain itself* compels denial of the government's motion.  To be sure, the government could easily have provided the "complete administrative record" supporting its decision, if such a record in fact exists.  For instance, the government could have provided an affidavit that explains the concrete steps of the government's alleged investigation or the type of legal analysis that is required of any litigant that asks a federal court to take any type of action.

The fact that the government has acted "arbitrarily and capriciously" is also underscored by the inconsistent positions the government has taken with respect to NHCA complaints.  As Relator demonstrated in the opposition, and as the government does not contest, DOJ attorneys have routinely partnered with NHCA to enforce the AKS and other federal statutes.  In none of these  other  actions  did  the  government  express  any  reservations  concerning  NHCA's

13

investigative and research methodologies or corporate structure.   And, indeed, none of the

supposed concerns the government proffered in its motion were communicated to Relator—or

the Court—until 12 months after the government's declination decision.  Clearly, for whatever

reason, the government has now decided to make NHCA a *persona non grata*.  But it is plain

that the government has acted in a way that lacks consistency and transparency—the very

definition of "arbitrary and capricious" action.  *Friedman v. Sebelius*, 686 F.3d 813, 828 (D.C.

Cir. 2012) ("The Secretary's decision, however, was arbitrary and capricious . . . because it

failed to explain its departure from the agency's own precedents"); *Ramaprakash v. FAA*, 346

F.3d 1121, 1125 (D.C. Cir. 2003) ("An agency's failure to come to grips with [its] conflicting

precedent   constitutes an inexcusable departure from the essential requirement of reasoned

decision making").

Finally, for all of government's contention that motions to dismiss FCA complaints are

routine, all of the dismissal examples the government identifies on page 10 of its reply stand in

stark contrast with the case before the Court:

- In *Sequoia Orange*, the government sought to dismiss a number of actions the government itself was prosecuting, and the reasons cited for dismissal were not merits-related.  *Sequoia Orange*, 151 F.3d at 1142-43 (noting the six reasons for dismissal, which included the goal of "end[ing] divisiveness in the citrus industry").  *After a four-day evidentiary hearing*, the district court granted the government's motion to dismiss, finding that "the government sought dismissal for legitimate government purposes; that the reasons offered by the government were rationally related to these legitimate government purposes; and that the dismissal was not arbitrary or capricious." *Id.* at 1143.

- In *United States ex rel. Wright v. Agip Petroleum Co., et al.*, No. 5:03-cv-00264-MHS-CMC (E.D. Tex. Feb. 2, 2005), Judge Folsom granted the government's motion to dismiss two of the relator's claims after finding that these claims were contrary to precedent and that "the government's purpose, to protect established precedent . . . and to protect the government's historical position in this regard, is valid." D.I. 646 at 9.  Judge Folsom also found, *after a hearing on the government's motion*, "merit in the government's argument that it already has spent countless months, manhours, and dollars collecting millions of documents

4829-6501-3897

in anticipation of discovery on the non-intervened claims asserted by [the relator] in this action." *Id.* at 11.

- In *United States ex rel. Piacentile v. Amgen Inc.*, after entering a substantial settlement with the defendant, the government sought to settle the relators' "weak" claims for $1.8 million.  "When Relators rejected that sum, [the court concluded that] the government was within its right to determine that further litigation was unlikely to lead to fraud prevention or additional recovery."  2013 U.S. Dist. LEXIS 141073, at *13 (E.D.N.Y. Sep. 30, 2013).

- In *United States ex rel. Stierli v. Shasta Services, Inc.*, the district court granted the government's motion filed after the end of discovery because the government had proven that the relator "cannot make any viable claim here on behalf of the governmental entities."  440 F. Supp. 2d 1108, 1114-15 (E.D. Cal. 2006).

In each of these cases, it is plain that the government had made a proper showing that dismissal was appropriate—by either demonstrating that the claims to be dismissed lacked merit, or that there was indeed a legitimate government interest that was furthered by dismissal.

The government has utterly failed to make a like showing here.  And the fact that, in the 150-year history of the FCA, the government cannot identify a single instance where it moved to dismiss a meritorious complaint in circumstances that mirror the ones here further underscores that the government's actions in this case are arbitrary and capricious.

## III.   CONCLUSION

For the foregoing reasons, the government's motion to dismiss should be denied.

4829-6501-3897

Dated:  March 4, 2019                                    Respectfully submitted,

*/s/ Sam Baxter*                                          */s/ W. Mark Lanier*
Samuel F. Baxter (co-lead counsel)              Mark Lanier (co-lead counsel)
sbaxter@mckoolsmith.com                         WML@LanierLawFirm.com
Jennifer L. Truelove                            Kenneth W. Starr (*pro hac vice* forthcoming)
jtruelove@mckoolsmith.com                       Ken.Starr@LanierLawFirm.com
MCKOOL SMITH P.C.                               Christopher L. Gadoury
104 East Houston, Suite 300                     Chris.Gadoury@LanierLawFirm.com
Marshall, Texas 75670                           Jonathan Wilkerson
(903) 923-9000                                  Jonathan.Wilkerson@LanierLawFirm.com
Fax: (903) 923-9099                             THE LANIER FIRM
                                                6810 FM 1960 West
Eric B. Halper                                  Houston, Texas 77069
ehalper@mckoolsmith.com                         (800) 723-3216
Radu A. Lelutiu                                 Fax:  (713) 659-2204
rlelutiu@mckoolsmith.com
Dana E. Vallera
dvallera@mckoolsmith.com
One Bryant Park, 47th Floor
New York, New York 10036
(212) 402-9400
Fax: (212) 402-9444

**ATTORNEYS FOR RELATOR**

4829-6501-3897

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on March 4, 2019 to counsel of record who are deemed to have consented to electronic services via the Court's CM/ECF system.  Any other counsel of record will be served by electronic mail, facsimile, U.S. Mail and/or overnight delivery.


*/s/ Radu A. Lelutiu*
Radu Lelutiu